# In the United States Court of Federal Claims

No. 19-244C

Filed: October 26, 2023

|  |
|---|
| **E&I GLOBAL ENERGY SERVICES, INC.,**<br><br>*Plaintiff,*<br><br>v.<br><br>**THE UNITED STATES,**<br><br>*Defendant.* |

*Joseph Whitcomb*, Whitcomb, Selinsky, P.C., Denver, CO, for Plaintiff.

*Christopher L. Harlow*, Trial Attorney, *Deborah A. Bynum*, Assistant Director, *Patricia M. McCarthy*, Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., with whom were *Thomas Cardova*, and *Trevor Upderaff*, Western Area Power Association, Denver, CO, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

      This case arises from a 2017 contract. Plaintiff, E&I Global Energy Services, Inc. ("E&I"), agreed to construct a high-voltage electricity substation. E&I's remaining claim alleges that the U.S. Department of Energy's Western Area Power Administration ("WAPA") improperly terminated the contract for default.[1] The Court finds that E&I's performance failures were not caused by excusable delays, thus WAPA's decision to terminate E&I for default was justified. The United States' Motion for Summary Judgment, (Def.'s Mot. for Summ. J., ECF No. 117), is granted.

---

[1] E&I appealed various aspects of the following decisions: (1) August 29, 2019 dismissal order; (2) April 15, 2021 summary judgment order; (3) April 15, 2021 judgment on the pleadings; and (4) January 10, 2022 post-trial decision. On December 30, 2022, the United States Court of Appeals for the Federal Circuit affirmed all this Court's decisions apart from its April 15, 2021 judgment on the pleadings disposing of E&I's default termination challenge. (ECF No. 106); *E & I Glob. Energy Servs., Inc. v. United States*, No. 2022-1472, 2022 WL 17998224 (Fed. Cir. Dec. 30, 2022). The Federal Circuit remanded this narrow issue for further factual development as to whether E&I's failure to complete its contract was caused by excusable delay. (*Id.*). The Mandate was issued on February 21, 2022. (ECF No. 107).

## I.     Background[2]

In June 2015, WAPA solicited bids to construct a high-voltage electricity substation in South Dakota. That September, WAPA awarded the contract to Isolux Corsan, LLC ("Isolux"). (Compl. Ex. 4, ECF No. 1-4). The contract required Isolux to provide all labor, materials, and equipment necessary to construct the substation. (*Id*.).

Liberty Mutual Insurance Company and the Insurance Company of the State of Pennsylvania (collectively referred to as "the Sureties") issued bonds guaranteeing that the project would be completed and Isolux's unfulfilled labor and materials obligations to third parties incurred in the performance of the project would be paid. *E&I Global Energy Servs*. v. *United States*, 144 Fed. Cl. 508, 510 (2019). Due to circumstances not at issue in this case, WAPA terminated the contract with Isolux for default in December 2016. *Id*. Pursuant to their bond obligations, the Sureties assumed responsibility for performance and outstanding Isolux debts. *Id*.

In March 2017, the Sureties and E&C Global, LLC ("E&C")—a subcontractor, (Compl. at 9, ECF No. 1), for Isolux—executed a Completion Agreement[3] for construction of the VT Hanlon Substation at a firm-fixed price of $5,428,625.69. (Compl. Ex. 1 (Completion Contract) at 2, ECF 1-1; DA26–27 (Tr. 25:25–26:13 (Jeffrey Bruce explaining role as previous electrical subcontractor), 28:12–29:7 (Jeffrey Bruce explaining understanding of responsibilities as

---

[2] There has been a legion of substantive decisions reciting the facts of this case. *See E&I Glob*. *Energy Servs*., *Inc*. *v*. *United States*, 144 Fed. Cl. 508 (2019) (Bruggink, J., granting the United States' Motion to Dismiss Counts 1–3 for failure to state a claim); *E&I Glob*. *Energy Servs*., *Inc*. *v*. *United States*, 153 Fed. Cl. 459 (2021) (granting in part and denying in part the United States' Motion for Summary Judgment and granting the United States' Motion for Judgment on the Pleadings); *E&I Glob*. *Energy Servs*., *Inc*. *v*. *United States*, 157 Fed. Cl. 317 (2022) (Post-Trial Opinion and Order for Judgment); *E & I Glob*. *Energy Servs*., *Inc*. *v*. *United States*, No. 2022-1472, 2022 WL 17998224 (Fed. Cir. Dec. 30, 2022) (decision affirming in part and reversing in part). The Court declines to bruise its chest rehashing long-known facts. The Federal Circuit's remand is narrow and leaves a single claim—the alleged wrongful termination for default. This Opinion recounts facts directly relevant to that claim.

[3] E&C and E&I are both owned by Jeffrey Bruce. (Compl. Ex. 1 at 15; Ex. 3 at 2, ECF No. 1-3). The Complaint originally named both entities as co-plaintiffs. (*See* Compl.). Throughout the duration of this suit and its appeal, E&I maintained that they were related and interchangeable because the entities shared an owner. At the pre-trial conference on October 14, 2021, the Court raised this issue with E&I, inquiring about the relationship between these two companies. (DA091 (Tr. 4:12–13)). E&I's counsel explained that E&C was "like [a] DBA [("doing business as")] under E&I." (DA091 (Tr. 4:17–20)). Based on an agreement by the parties, the Court dismissed E&C as a party with prejudice. (ECF No. 88). This presents issues addressed in the analysis below.

previous subcontractor)).[4] The Completion Agreement's firm-fixed price was "all-inclusive," and included "subcontractor and vendor costs," "labor force" costs, as well as "all other direct and indirect costs of performance." (Compl. Ex. 1 at 2). Additionally, the Completion Agreement provides that E&C, as Completion Contractor certifies that it:

> (i) examined the Bonded Contract together with all amendments or addenda; (ii) *visually investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site)*; and (iii) fully informed itself with respect to those items required to complete the Work and perform all of the obligations required hereunder independent of any representations or warranties, either expressed or implied, of Sureties, Obligee, or any of their respective employees, agents, consultants, or representatives.

(*Id.* at 10 (emphasis added)). Importantly, E&I is named as a subcontractor in this Completion Agreement. (*Id.* at 17).

Pursuant to their bond obligations, the Sureties assumed responsibility for performance and any outstanding Isolux debts. The parties to the contract agreed that E&C and E&I would not be responsible for Isolux's outstanding debts to subcontractors and suppliers. *E & I Glob. Energy Servs., Inc.*, 2022 WL 17998224, at *1; (Compl. Ex. 1 at 11). On March 28, 2017, the parties executed an agreement ("Tender Agreement") installing E&C as the project's Completion Contractor. The Tender Agreement provides, among other things, that:

> Sureties hereby tender Completion Contractor to [WAPA], and [WAPA] accepts such tender to Completion Contractor. By execution of this Agreement, [WAPA] agrees to assume all obligations of Sureties, as applicable, under the Completion Agreement and will be entitled to all of the rights, remedies, and benefits of the Completion Agreement as it relates to Completion Contractor; provided, however, that the terms and conditions of Sections 3 and 16 of the Completion Agreement shall survive this tender of Completion Contractor, such that the benefits and obligations of Sections 3 and 16 of the Completion Agreement shall remain with and continue to run to Sureties and shall not pass to [WAPA], regardless of anything provided for in this Agreement.

(Compl. Ex. 2 at 1 (Tender Agreement), ECF No. 1-2).

Following the execution of the Tender Agreement, WAPA and E&I executed a Follow-On Contract for the completion of the VT Hanlon Substation. (*See* Compl. Ex. 3 (Follow-On Contract)). On May 8, 2017, WAPA issued a conditional notice to proceed, authorizing E&I to begin work on the substation's control building and erect steel on the work site. *E&I Global Energy Servs. v. United States*, 153 Fed. Cl. 459, 465 (2021). On September 12, 2017, WAPA

---

[4] The United States attaches a consecutively paginated Appendix to its Motion for Summary Judgment. (DA, ECF No. 117-1). The Court cites that appendix using "DA___."

issued a formal notice to proceed, authorizing E&I to commence the Follow-On Contract's primary activities. *Id*. This notice cemented that E&I was required to complete construction of the substation by April 3, 2018. *Id*.

After it began performance, E&I alleges that it immediately ran into delays. (Compl. at 12). According to E&I, Isolux owed payments to the subcontractors and suppliers it sought to employ, thus they refused to continue to work on the project until they were paid past due amounts. (*Id*.). Though the Sureties were required to pay Isolux's project-related debts, they allegedly failed to timely fulfill those obligations. (Compl. Ex. 1 at 5, 11; Compl. at 13). To complete the project, E&I paid the suppliers and subcontractors what they claimed to be owed by Isolux. (Compl. at 13). E&I asserts that these payments strained its finances, and E&I "express[ed] concerns about . . . being able to pay its employees and subcontractors." (*Id*. at 16). E&I asserts that it missed the contract deadline because of these difficulties.

By early 2018, E&I had removed equipment and personnel from the work site, leading WAPA to conclude that E&I abandoned the project.[5] *E&I Global Energy Servs*., 153 Fed. Cl. at 465. After E&I failed to rectify concerns regarding abandonment and complete construction by the deadline, WAPA terminated the Follow-On Contract for default on May 18, 2018. *Id*. On October 1, 2018, E&I submitted a certified Contracts Disputes Act ("CDA") claim seeking $3.6 million in damages and reversal of its default termination. *Id*. The WAPA contracting officer ("CO") denied E&I's claim on December 17, 2018. *Id*. E&I brought this litigation on February 12, 2019. (Compl.).

## II.   Analysis

The remaining issue before the Court is whether E&I's failure to timely perform its contract was attributed to excusable delay and whether its termination should be converted to one for convenience. The United States moves for summary judgment arguing that default termination was proper. (*See generally* Def.'s Mot. for Summ. J.). The Court ultimately finds that the United States has successfully established that no genuine issue of material fact precludes judgment.

The Court may grant summary judgment if the pleadings, affidavits, and evidentiary materials reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Facts are material if they "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine factual dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. A party seeking to establish a genuine dispute of material fact must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored

---

[5] There is some dispute over the exact amount of equipment and personnel removed from the work site. (Pl.'s Resp. at 5–6, ECF No. 119). This distinction is immaterial as E&I's exact "level" of abandonment has no direct bearing here.

information, affidavits or declarations, stipulations [ ], admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

Although "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment may still be granted when the party opposing the motion submits evidence that "is merely colorable . . . or is not significantly probative." *Anderson*, 477 U.S. at 251 (internal citation omitted). Courts may only grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita, Elec. Indus. Co., Ltd. v. United States*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In termination for default cases, the United States must establish that "the [CO's] decision to terminate . . . was reasonable given the events that occurred before the termination decision was made." *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1357–58 (Fed. Cir. 2004); *see id.* at 1358 (affirming the Board's finding that the CO "had a reasonable basis for default termination" (citation omitted)); *Danzig v. AEC Corp.*, 224 F.3d 1333, 1336 (Fed. Cir. 2000) (noting that "the government [must] show that it was reasonable for the [CO] to conclude that [the contractor] would be unable to complete the project by what the Board found to be the proper completion date"). If the United States meets that burden, the contractor must prove "that its nonperformance was excusable." *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996); *see also McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1353 (Fed. Cir. 2009) ("*McDonnell Douglas IX*") (noting that burden shifts to contractor to rebut government's untimeliness showing or to establish "that there was excusable delay"), *vacated and remanded on other grounds by Gen. Dynamics Corp. v. United States*, 563 U.S. 478 (2011). One relevant question to a contractor's alleged default is whether the contractor has met contract specifications. *Lanterman v. United States*, 75 Fed. Cl. 731, 734 (2007) (citing *McDonnell Douglas v. United States*, 182 F.3d 1319, 1328 (Fed. Cir. 1999) ("*McDonnell Douglas V*"). A clear violation of contract terms—like failure to complete the contract by the specified date— creates a presumption that a reasonable, contract-related basis for the termination exists. *McDonnell Douglas V*, 182 F.3d at 1328.

E&I argues that its delay in completing the Contract was beyond its control and therefore excusable. If a court finds the contractor's default was excusable, "the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government." FAR 52.249-10(c). To establish excusable delay, contractors must demonstrate that their untimely performance was attributable to unforeseeable causes beyond their control and without their fault or negligence. *See, e.g., Gen. Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir. 2008).

By its explicit terms, FAR 52.249–10(c) is not triggered where the contractor bears responsibility for the delay. *Id.* at 1365; *see also Am. Med. Equip., Inc. v. United States*, 160 Fed. Cl. 344, 358 (2022). Any excusable delays must alter the critical path of the project, "usually result[ing] in a corresponding delay to the completion of the project." *Wilner v. United States*, 24 F.3d 1397, 1399 n.5 (Fed. Cir. 1994). To carry its burden, contractors must present the Court with sufficient evidence to demonstrate whether the contractor would have completed the project but for the excusable delay in consideration of all material factors. *Marine Indus. Constr., LLC v.*

5

*United States*, 158 Fed. Cl. 158, 205 (2022). A contractor must also "prove that it took reasonable action to perform the contract notwithstanding the occurrence of such excuse," and the "unforeseeable cause must delay the overall contract completion; i.e., it must affect the critical path of performance." *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000) (quoting *Int'l Elecs. Corp. v. United States*, 646 F.2d 496, 510 (Cl. Ct. 1981)). To make a finding on reasonableness, the trier must focus on "tangible, direct evidence reflecting the impairment of timely completion," *McDonnell Douglas, Inc. v. United States*, 323 F.3d 1006, 1016 (Fed. Cir. 2009) ("*McDonnell Douglas VII*").

The Federal Acquisition Regulation ("FAR") standard clause incorporated in the Contract provides the following concerning causes of excusable delay in fixed-price construction contracts:

> Examples of such causes include (i) acts of God or of the public enemy, (ii) acts of the Government in either its sovereign or contractual capacity, (iii) acts of another Contractor in the performance of a contract with the Government, (iv) fires, (v) floods, (vi) epidemics, (vii) quarantine restrictions, (viii) strikes, (ix) freight embargoes, (x) unusually severe weather, or (xi) delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers . . . .

FAR 52.249-10(b)(1)(iii), (xi). Relevant to this provision, E&I asserts that the record demonstrates the impact of "acts of another Contractor," "unusually severe weather," "delays of subcontractors or suppliers at any tier," and "acts of the Government" in dealing with the Sureties on E&I's ability to timely complete the electrical substation project. (Pl.'s Resp. at 9, ECF No. 119).

The Court will first address the actions of E&I's intended subcontractors who would not perform before payment was issued. As E&I puts it, it believes that the record in this case demonstrates "that E&I's inability to complete the substation project was caused by the actions of other contractors." (Pl.'s Resp. at 2). E&I purports to have been left with no other option but to pay the debts Isolux owed to its subcontractors, specifically: American Fence Company; Duke Aerial; Dakota Constructors; and LE Myers. (DA298–99 (E&I Third Interrogatory Responses)).

The Federal Circuit acknowledged that, in some instances, a workers' strike can constitute an adequate excuse for delay if it substantially impairs the contractor's performance of contractual duties. *E & I Glob. Energy Servs., Inc.*, 2022 WL 17998224, at *4 (citing *Int'l Elecs.*, 646 F.2d at 509–10). However, a contractor must also prove that it took reasonable action to perform the contract notwithstanding the occurrence of such excuse, and the unforeseeable cause must delay the overall contract completion. *Int'l Elecs.*, 646 F.2d at 510. Here, E&I admits that "[n]o attempts were made to locate alternative subcontractors and suppliers to replace Isolux's former subcontractors and suppliers." (DA016 (E&I Second Interrogatory Responses)). This was due in large part to what E&I presumed would be increased costs. (Pl.'s Resp. at 12 ("To hire replacement subcontractors (assuming any were available during a rural South Dakota winter . . .)—would have substantially increased costs without dealing with the pressing issue of equipment rental companies, material suppliers, and other subcontractors showing up on the

6

work site and disrupting operations.")). Tellingly, E&I provides no evidence that replacing the subcontractors would actually have been more costly. The Court cannot grant relief based on conjecture.

Nor were the issues with subcontractors unforeseeable. In his deposition, Jeffrey Bruce ("Mr. Bruce") testified that he assumed a "mediator" role on behalf of Isolux and attempted to resolve longstanding pay disputes with its subcontractors. (DA025 24:1–3 ("I kept trying to play the mediator between WAPA and [Isolux's subcontractors] to, you know, to keep everybody happy[.]"); *see also* DA043 (Tr. 96:17–23)). Mr. Bruce acknowledged that "all" of Isolux's subcontractors were unhappy. (DA038 (Tr. 74:20–75:9 (Jeffrey Bruce naming affected subcontractors)). In his capacity as a middleman, Mr. Bruce described the regular "yelling and complaining" from subcontractors upset with Isolux's financial issues. (DA038 (Tr. 75:7–9 ("[I]t seemed like, just about daily, you know, kind of yelling and complaining[.]")). But this occurred before E&I acquired the contract. To expect the temperaments to immediately cool once Isolux was no longer in charge is not reasonable; pavement is still hot after the sun goes down. Thus, the circumstances surrounding the protesting subcontractors' qualms were foreseeable by E&I.

Relatedly, E&I argues that the Sureties' failure to pay Isolux's debts substantially impaired its ability to meet the contract deadline. As the Federal Circuit characterized this issue, "[t]he Sureties' alleged failure to pay Isolux's debts here closely matches a paradigmatic cause of excused delay: the acts of another government contractor." *E & I Glob. Energy Servs., Inc.*, 2022 WL 17998224, at *4 (citing FAR 52.24910(b)(1)(iii)). This is parallel to E&I's assertion that the United States is to blame for its failure to enforce the Sureties' payment obligations. FAR 52.249-10(b)(1)(ii) (providing "acts of the Government in . . . its . . . contractual capacity" as one excused cause of delay).

This brings the Court to the troubling assertion that E&I was the "Completion Contractor" in relation to the contract with the Sureties. It was not. As illustrated above, the Completion Agreement names E&I only as a subcontractor, *not* the Completion Contractor. E&C was named as the Completion Contractor. (Compl. Ex. 1 at 16–17). This was not an issue until it was. (*See supra* n.3). E&I sued one of the Sureties in South Dakota to recover from its alleged breach. At trial, Mr. Bruce "testified that [E&I and E&C] 'didn't gel well together' due to having 'different philosophies.'" *E&I Glob. Energy Servs. v. Liberty Mut. Ins. Co.*, No. 20-4033, 2023 U.S. Dist. LEXIS 104225, at *2 (D.S.D. June 13, 2023). Based on Mr. Bruce's testimony, the United States District Court for the District of South Dakota found "that E&I and E&C are separate legal entities."[6] *Id*. Ultimately, that court rejected all of E&I's claims against Liberty Mutual, holding that E&I may not recover E&C's breach of contract damages.[7] *Id*. at *47. E&I

---

[6] The Court recognizes that the District Court's Opinion is subject to a Motion to Review and is only persuasive. This does not change the weight this Court gives to Mr. Bruce's testimony in that litigation.

[7] Even in light of the District Court of South Dakota's Opinion, E&I continues to refer to itself as the "Completion Contractor." (Pl.'s Resp. at 1 ("[]E&I, was selected as the completion

cannot demonstrate that it reasonably assumed that the contractual promises the Sureties made to E&C applied in equal force to E&I. This is irrational and cannot form the basis for excusable delay. In a similar vein, it would be incongruous to find that the Sureties' failure to pay subcontractors could negatively impact E&I when the South Dakota District Court found that E&I could not be a victim of breach.

Even if E&I were, as it claims, the "Completion Contractor," there is no evidence that it took steps to enforce the Sureties' bond provisions. And, as the Federal Circuit iterated, even if the United States had attempted to enforce those provisions, it was also not the intended beneficiary of those provisions of the Completion Agreement. *E & I Glob. Energy Servs., Inc.*, 2022 WL 17998224, at *4 (holding the United States may not benefit from a contract provision when it was not the intended beneficiary). Further, as a prior subcontractor to Isolux, E&I presumably had also not been paid, also evidencing some level of foreseeability.

As to whether E&I's strained financial situation formed an excusable basis for delay, the Court is unpersuaded. There is no doubt that E&I was financially strapped, and the Court is sympathetic. In its pleadings, E&I alleges that it had to single-handedly fund unforeseeable expenses that were not its responsibility; taken in conjunction with the money it paid to subcontractors, this allegedly increased the burden on E&I. (Compl. at 13 ("[B]ecause E&I was concerned about completing the job on time, and in reliance upon the CO's assurances that "any issues will be addressed as they come up," E&I paid for the missing equipment and . . . subcontractors for amounts due from Isolux.")). Over one million dollars of these funds pertain to "missing equipment" that E&I claims the Sureties were required to provide. (Compl. Ex. 20, ECF 1-20).[8] That equipment included:

---

contractor pursuant to agreements between WAPA, Isolux's bond sureties - Liberty Mutual Insurance Company and The Insurance Company of the State of Pennsylvania . . ., and E&I.")). Again, it was not. E&I attempts to minimize, stating that "the Sureties sometimes referred to . . . E&C Global, LLC." (Pl.'s Resp. at 18). That is putting it lightly, as the Sureties *contracted* with E&C, and any promises they made regarding Isolux's subcontractors and suppliers were made only to E&C. (*See* Compl. Ex. 1 at 1, 11). The Court notes that this representation to the Court may constitute a legal or factual contention not supported by evidence in violation of RCFC 11(b)(2)–(3).

[8] The remaining third (approximately $500,000) of the properly calculated amount pertains to labor wages mandated by the Davis Bacon Act, though that argument has been withdrawn. (Pl.'s Resp. at 17 ("Defendant is correct that any financial difficulties arising from unanticipated increased in labor costs cannot form the basis for excusable delay.")).

| Item | Cost | Vendor | 10% overhead | 15% Profit Markup | 8.5% Tax rate | PO# | Date Paid |
|---|---|---|---|---|---|---|---|
| Voltage Transformer 115 KV/1ph | $25,305.87 | ABB | $2,530.59 | $3,795.88 | $2,688.75 | 3661-1020 | 7/19/2017 |
| Voltage Transformer 69KV / 1 Ph | $30,275.94 | ABB | $3,027.60 | $4,541.39 | $3,216.82 | 3661-1020 | 7/19/2017 |
| Capacitor 12.47KV 50 KVAR /1 Ph | $2,198.31 | Border State | $219.83 | $329.74 | $233.57 | 3661-1018 | 8/2/2017 |
| Distribution Trans 69-12.47 KV 500KVA 3Ph | $60,410.00 | Uptegraff | $6,041 | $9,061.50 | $6,418.56 | 3661-1008 | |
| Station Service Trans 12.47KV 500KVA 3Ph | $26,625.00 | ABB | $2,663 | $3,994 | $2,828.97 | 3661-1019 | |
| Outdoor Switchgear Assembly & Fusible SW | $85,502.33 | Border State | $8,550.23 | $12,825.35 | $9,084.62 | 3661-1021 | 7/19/2017 |
| Outdoor Distribution Panels (3) | $26,474.42 | Border State | $2,647.44 | $3,971.16 | $2,812.90 | 3661-1021 | 7/19/2017 |
| Station Post Insulators | $214,059.57 | Dutton Lainson | $21,405.96 | $32,108.94 | $22,743.83 | 3661-1065 | |
| VT Hanlon Overhead Bus | $314,224.53 | Border State | $31,422.45 | $47,133.68 | $33,386.36 | 3661-1003 | |
| **Total:** | **$785,075.97** | | **$78,507.60** | **$117,761.39** | **$83,414.38** | | |

(DA013 (E&I's Second Interrogatory Responses)). The Court finds that this was neither unforeseeable nor beyond E&I's control.

 E&I claims that it was not responsible for payment for this equipment because the Completion Agreement provided that the total firm-fixed price did not include "materials ordered by, but not paid by, [Isolux] prior to the date of this Agreement." (Compl. Ex. 1 at 3). Accordingly, the "Completion Contractor shall not be responsible for satisfying an indebtedness associated with materials ordered by Principal prior to the date of this Agreement." (*Id*. at 5). Again, E&I is not the named Completion Contractor. Like its other arguments, it appears that E&I assumed that the Sureties' promises to E&C equally applied to E&I, but E&I cannot support that assumption. At the risk of beating a dead horse, by making this argument, E&I seeks to benefit from a contractual provision as to which it was not the intended beneficiary. *See E & I Glob. Energy Servs.*, 2022 WL 17998224 at *4 (holding that the United States cannot seek to benefit from a contract when it was not the intended beneficiary). The purpose of this provision was to protect the Completion Contractor, not the subcontractor. Though E&I ultimately supplanted E&C as the VT Hanlon prime contractor, it is unreasonable for E&I to assume that the Sureties promises to E&C would also apply to E&I.

 Even if E&I were the Completion Contractor, E&I should have known about the "missing equipment" prior to disbursing payment. This is for three reasons: (1) E&I was a subcontractor for Isolux and knew the site conditions; (2) it was unreasonable to chalk missing equipment up to Isolux's faulty recordkeeping; and (3) Mr. Bruce conducted at least two site visits before acquiring the construction contract. In support of its "missing equipment" excusable delay argument, E&I largely relies on an October 7, 2016 status update it received from Isolux. (DA108–14 (E&I's Missing Equipment Submission)). However, an individualized evaluation of each of these "missing" items confirms that they do not support E&I's excusable delay claim.

 Before it executed the Completion Agreement, E&I knew (or should have known) that Isolux had not ordered seven of the nine pieces of equipment, thus it could not be covered by the Completion Contract. For instance, $314,224.53 of E&I's purported "missing equipment" expenditures relate to the VT Hanlon overhead bus. (DA013 (E&I's Second Interrogatory

9

Responses)). The United States convincingly argues that E&I's records document its knowledge that no Isolux order existed for the VT Hanlon Overhead Bus. (DA111 (E&I's Missing Equipment Submission) (stating "No Isolux PO available")). Isolux's status update identifies the overhead bus as still "UNDER REVIEW." (DA114 (Item # 32); *see also* DA036 (Tr. 68:14–25 (confirming that the overhead bus is included in Item # 32))). Mr. Bruce admitted that this note indicated that WAPA had not yet approved this item. (*See* DA036 (Tr. 65:14–18 (describing "Under Review" status))). E&I's notes indicate knowledge that the overhead bus was missing from the worksite on November 16, 2016. (DA111; *see also* DA027 (Tr. 29:25–30:3 (describing E&I's November 16, 2016 notations))).

Similarly, $214,059.57 of E&I's expenditures relate to station post insulators. (DA013). Again, no Isolux order exists for this equipment, which should have been a red flag to E&I. E&I noted the items as missing on November 16, 2016. (DA111 (E&I's 2018 Missing Equipment Submission)). Further, Mr. Bruce has since admitted that he knew that the station post insulators were missing and that he agreed to pay for them before he contracted with Liberty Mutual:

> Q: Do you recall that E&I assisted Isolux with procuring – or attempting to procure the station post insulators on the project?
>
> A: Yes.
>
> Q: And what is your recollection of that incident?
>
> A: The insulators were originally supposed to be purchased by them, but I want to clarify that. Through all of our negotiations with Liberty and everybody else, I said I would take responsibility for that. That's mine. There's no doubt about it. That is mine because that's what I said.
>
> Q: So you told Liberty that you would take responsibility for purchasing and payment of these station post insulators?
>
> A: Yeah. During our signing and all that stuff.

(DA286 (Excerpts of Examination of Jeffrey A. Bruce (D.S.D. Feb. 16, 2023)) Tr. 502:8–21).

As to five other pieces of "missing equipment," E&I claims it unforeseeably paid for (1) two Voltage Transformers, together totaling $55,581.81; (2) Station Service Transformer, totaling $26,625.00; (3) Outdoor Distribution Panels, totaling $26,474.42; and (4) Outdoor Switchgear Assembly, totaling $85,502.33. (Compl. Ex. 3 at 4–7). These claims suffer the same deficiencies evidencing that E&I *knew* that Isolux had not actually ordered these items as no order forms exist. (DA109 (voltage transformers and stations service transformer); DA11 (outdoor panels)). Similarly, E&I again noted that these items were missing from the worksite in November 2016. (DA109, 111). It was unreasonable for E&I to assume that orders existed when all signs pointed otherwise. E&I responds to this, stating that, "[t]he fact that no Isolux purchase order existed (or was known to E&I at the time that list was created) does not necessarily mean that Isolux did not actually order the equipment: the only thing the 'No Isolux PO Available' label shows is that Isolux kept poor records." (Pl.'s Resp. at 15). This is not probative. Again, mere speculation will not preclude summary judgment.

There are two pieces of equipment—the Distribution Transformer, totaling $60,410.00, and a Capacitor 12.47kV 50 KVAR / 1ph, totaling $2,198.31—that had associated Isolux Order forms. (DA109–10). However, E&I's notes indicate that these items were missing in November 2016, five months after they had purportedly been "approved," which is another red flag. (*Id.*). There is also no evidence that E&I fully paid for the Distribution Transformer, only that it paid $2,198.31 on August 2, 2017. (DA013). This represents a scintilla of what E&I claims it had to shell out, (*see* DA013), thus it cannot be said that such an expense altered the critical path of the project. Further, Mr. Bruce inspected the worksite after Isolux had been terminated and before acquiring the Contract; in the Completion Contract, he certifies to doing so. E&I explained to the District Court that a representative of the Sureties and Mr. Bruce "inspected the VT Hanlon job site together around December 20, 2016. The men visited the site for approximately two hours. The government, through its agency WAPA escorted the two men through at least part of that inspection." (DA273 (internal record citations omitted)). E&I expressly warranted that it had "visually investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site)[.]" (Compl. Ex. 1 at 10). With the knowledge of the site and what equipment was missing at least three months before the Completion Contract was executed, a reasonable contractor would be behooved to rectify those issues before submitting a bid. The circumstances here were within E&I's control and cannot excuse its delay in completing the Contract.

E&I also presents missing schematics that purportedly excuse its delay. (Pl.'s Resp. at 17). Per that claim, a WAPA employee attempted to send four emails that each attached different sections of a 533-page wiring schematic on June 27, 2017. (Pl.'s Mot. to Compel at 4, ECF 111). According to E&I, only three of the four emails were delivered. (*Id.*). The fourth email, containing eighty-nine pages of the schematic package, was undeliverable and E&I did not receive these eighty-nine pages until late July 2017. (*Id.*). There are jurisdictional concerns considering this argument for the first time, after trial, appeal, and remand. Nonetheless, E&I was required to raise this issue with WAPA within ten days of its occurrence. FAR 52.249-10(b)(2). E&I, however, failed to do so until January 23, 2023, as part of a discovery request in its South Dakota litigation. (DA302). In total, E&I waited 2,002 days to raise this issue. Therefore, it is waived.

Finally, concerning E&I's "unusually severe weather" argument, the Court remains unpersuaded. Specifically, E&I asserts that the December 2016 site inspection was "cut short." (Pl.'s Resp. at 16). In support of this argument, Mr. Bruce said, "[t]he reason we didn't go through the rest of it [a site inspection with WAPA personnel during turnover] is because the job was real muddy, so we couldn't get to most of it." (DA39). First, this runs counter to the certification that Mr. Bruce "visually investigated the status of and the conditions affecting the Work (including, but not limited to, the locality and Project site)." (Compl. Ex. 1 at 10). The onus is on the contractor to complete the site inspection. Further, FAR 52.249-10(b)(1)(iii) refers to unusually severe weather during the pendency of the contract, not conditions that may have affected the site condition. In fact, assuming that the site was too muddy to fully inspect, that is a condition that would have been known to Mr. Bruce at the time the Completion Agreement was executed, thus it cannot be said that those conditions were unforeseeable. This cannot support E&I's argument for excusable delay.

### III. Conclusion

As explained above, the Court can find no excusable delay that hindered the completion of the subject contract. Therefore, WAPA's decision to terminate E&I for default was justified. The United States' Motion for Summary Judgment is **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**



s/ David A. Tapp
DAVID A. TAPP, Judge